**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | **Cr. No. _____** |
| **Plaintiff,** : | |
| : | **(Foreign Corrupt Practices Act –** |
| **v.** : | **Internal Controls and Books and** |
| : | **Records Provisions, 15 U.S.C. §§** |
| : | **78m(b)(2), 78(b)(5), and 78ff(a)** |
| : | |
| **SIEMENS AKTIENGESELLSCHAFT,** : | |
| : | |
| **Defendant** : | |
| : | |

# I N F O R M A T I O N

The United States Attorney, and the Department of Justice, Criminal Division, Fraud

Section charge, at all times relevant to this Information, or at the dates and times indicated:

## INTRODUCTORY ALLEGATIONS

### THE FOREIGN CORRUPT PRACTICES ACT

1.      The Foreign Corrupt Practices Act of 1977 (hereinafter, the "FCPA"), as

amended, 15 U.S.C. §§ 78dd-1 *et seq.*, prohibited certain classes of persons and entities from

making payments to foreign government officials to obtain or retain business, as well as required

certain entities to maintain accurate books and records and adequate internal controls.

2.      In relevant part, the FCPA's anti-bribery provisions prohibited any issuer of

publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78*l*, or required to file periodic reports with the United States Securities and

Exchange Commission under Section 13 of the Securities Exchange Act, 15 U.S.C. § 78(o)d

(hereinafter, "issuer") from making use of the mails or any means or instrumentality of interstate

commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for or with, or directing business to, any person or securing any improper advantage.  15 U.S.C. § 78dd-1(a)(3).

3.      Pertinent to the charges herein, the FCPA's accounting provisions required, among other things that issuers make and keep books, records, and accounts that accurately and fairly reflect transactions and disposition of the company's assets and prohibited the knowing falsification of such books, records, or accounts.  15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a).  The FCPA's accounting provisions also required that issuers maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to (I) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action was taken with respect to any differences.  15 U.S.C. § 78m(b)(2)(B).  The FCPA also prohibited the knowing circumvention or failure to implement such a system of internal accounting controls.  15 U.S.C. §§ 78m(b)(5) and 78ff(a).

## SIEMENS AND OTHER RELEVANT ENTITIES AND INDIVIDUALS

*Corporate Governance and Structure*

4.      Defendant SIEMENS AKTIENGESELLSCHAFT ("SIEMENS") was a

corporation organized under the laws of Germany with its principal offices in Berlin and

Munich, Germany, and, through its operating groups, subsidiaries, officers, directors, employees,

and agents, was engaged in a variety of business activities for, among others, national, state, and

municipal governments.  This included, among other things, developing, constructing, selling,

and servicing telecommunications equipment and systems; power generation, transmission, and

distribution equipment and systems; transportation equipment and systems; medical equipment

and systems; and industrial and traffic equipment and systems.

5.      As of March 12, 2001, SIEMENS was listed on the New York Stock Exchange

("NYSE") and was an "issuer" as that term is used in the FCPA.  15 U.S.C. § 78dd-1(a).  By

virtue of its status as an issuer, SIEMENS was required to comply with the provisions of the

FCPA.

6.      SIEMENS was organized in a matrix-like structure with both operating groups

and regional companies, organized by location.  The functions of operating groups and regional

companies often overlapped, though each operated independently with minimal, if any,

centralized reporting mechanisms beyond financial reporting.  Over 1,800 legal entities operated

as part of the SIEMENS group of companies.

7.      SIEMENS' Supervisory Board (the "Supervisory Board"), based in Munich,

Germany, was the highest-level board within SIEMENS and was composed of twenty members,

ten of whom were elected by the shareholders and ten of whom were elected by the employees.

The Supervisory Board had the authority to appoint and remove members of the Managing

Board, known in German as the "Vorstand," but was not permitted to make management decisions or give directions to management.

8.     SIEMENS' Vorstand, based in Munich, Germany, was the Managing Board for SIEMENS and was composed of eleven members.  Pursuant to the Bylaws of the Managing Board, as they existed at the time, a Corporate Executive Committee (the "SIEMENS ZV") was created, with a maximum number of nine members.  The SIEMENS ZV was authorized to make all management decisions unless specifically reserved by the Managing Board.  Most SIEMENS ZV members "coached," or had oversight responsibility for, both a geographic region and an operating group.

9.     SIEMENS' Audit Committee (the "Audit Committee"), based in Munich, Germany, was composed of a subset of the Supervisory Board and was responsible for the supervision of accounting and risk management, compliance, ensuring the independence of SIEMENS' external auditor, engaging the external auditor for the audit of SIEMENS' financial statements, determining the focus of the audit, and agreeing on the audit fees.

10.     As part of the legal function, SIEMENS' lawyers, based in Erlangen and Munich, Germany, advised on corporate and compliance matters and supported the SIEMENS operating groups and regional companies in legal matters, including drafting and reviewing contracts, participating in customer negotiations, and reviewing and analyzing third party legal claims against SIEMENS.  Those lawyers relevant to this matter reported to the General Counsel.

11.     SIEMENS' compliance function was established in 2001 and in 2004 a Corporate Compliance Office (the "Corporate Compliance Office") based in Erlangen and Munich, Germany was established.  It was composed of several lawyers responsible for compliance

initiatives within SIEMENS, but who were also responsible, at least until 2006, for defending

SIEMENS against outside allegations and for handling compliance investigations.

12.     SIEMENS' Regional Compliance Officers (the "Regional Compliance Officers")

and Group Compliance Officers (the "Group Compliance Officers") were employees who were

responsible for compliance at the regional companies and the operating groups, respectively.

Many of the Regional Compliance Officers and Group Compliance Officers had other full-time

responsibilities besides compliance, and they received minimal training or direction regarding

their compliance responsibilities.

*Select Operating Groups*

13.     SIEMENS' former Communications operating group ("COM"), headquartered in

Munich, Germany, was responsible for the design, manufacture, sale, and service of mobile and

fixed telecommunications systems.  COM operated worldwide, and a substantial portion of its

business was with foreign government entities.  Prior to October 1, 2004, the communications

business was operated by two separate groups, Siemens Information and Communication Mobile

Group ("ICM") and Information and Communication Network Group ("ICN").

14.     ICM was responsible for the design, manufacture, sale, and service of mobile

telecommunications systems.

15.     ICN was responsible for the design, manufacture, sale, and service of fixed

network telecommunications systems.

16.     SIEMENS' Industrial Solutions and Services operating group ("I&S"),

headquartered in Erlangen, Germany, was responsible for the development, design, construction,

sale, operation, and maintenance of infrastructure and automation equipment and systems.  I&S

operated worldwide, and a substantial portion of its business was with foreign government entities.

17.     SIEMENS' Power Generation operating group ("PG"), headquartered in Erlangen, Germany and with subsidiary offices in Orlando, Florida, was responsible for the development, design, construction, operation, and maintenance of large-scale power plants.  PG operated worldwide, and a substantial portion of its business was with foreign government entities.

18.     SIEMENS' Power Transmission and Distribution operating group ("PTD"), headquartered in Erlangen, Germany and with subsidiary offices in Wendell, North Carolina, was responsible for the design, manufacture, sale, and service of power transmission and distribution equipment, software and network control equipment.   PTD operated worldwide, and a substantial portion of its business was with foreign government entities.

19.     SIEMENS' Transportation Systems operating group ("TS"), headquartered in Erlangen, Germany and with subsidiary offices in Sacramento, California, was responsible for the development, design, construction, sale, operation, and maintenance of trains, train tracks, and railway systems.  TS operated worldwide, and a substantial portion of its business was with foreign government entities.

20.     SIEMENS' Medical Solutions operating group ("MED"), headquartered in Erlangen, Germany, was responsible for the development, sale, and service of medical products, medical equipment, and health care information systems, as well as the provision of management consulting and support services.  MED operated worldwide, and a substantial portion of its business was with foreign government entities.

*Select Senior Officers and Directors*

21.     "Officer A," a German citizen, was President and Chief Executive Officer of SIEMENS from 1992 to 2005, a senior member of the SIEMENS ZV from 1992 to 2005, and Chairman of the Supervisory Board from 2005 to 2007.

22.     "Officer B," a German citizen, was General Counsel from 1992 to 2004 and the Chief Compliance Officer from 2004 until the end of 2006.

23.     "Officer C," a German citizen, was Chief Financial Officer of SIEMENS from 1998 to 2006.

24.     "Officer D," a German citizen, was a member of the SIEMENS ZV and a senior executive with management and oversight responsibility for PTD and the Americas from 2000 until 2007.

25.     "Officer E," a German citizen, was a member of the SIEMENS ZV from 1994 until 2007.

26.     "Officer F," a German citizen, was a member of the SIEMENS ZV from 2003 to 2007.

27.     "Officer G," a German citizen, was President and Chief Executive Officer of SIEMENS from 2005 to 2007.

*United Nations Oil for Food Program:  Select Entities and Individuals*

28.     Siemens S.A.S. of France ("Siemens France"), SIEMENS' regional company in France, entered into contracts for power station renovation, servicing, and spare parts, with the Iraqi government in connection with the United Nations Oil for Food Program.  All of Siemens France's contracts under the United Nations Oil for Food Program (the "OFFP") were entered into in partnership with PG or PTD.

7

29.     Siemens Sanayi ve Ticaret A.S. of Turkey ("Siemens Turkey"), SIEMENS' regional company in Turkey, sold power and electrical equipment to the Iraqi government in connection with the OFFP.

30.     Osram Middle East FZE ("Osram Middle East") was the United Arab Emirates-based subsidiary of Osram GmbH, which was a wholly-owned subsidiary of SIEMENS.  Osram Middle East sold light bulbs and lighting equipment to the Iraqi government in connection with the OFFP.

31.     Gas Turbine Technologies S.p.A. ("GTT"), an Italian subsidiary of SIEMENS, contracted to sell gas turbines to the Iraqi government in connection with the OFFP.

32.     "OFFP Agent A," a Paraguayan company registered in Jordan, acted as an agent for Siemens France and Siemens Turkey in connection with sales to the Iraqi government made through the OFFP.

33.     "OFFP Agent B," an Iraqi citizen, acted as an agent for Osram Middle East in connection with sales to the Iraqi government made through the OFFP.

34.     "OFFP Agent C" and "OFFP Agent D," Iraqi citizens, acted as agents for GTT in connection with sales to the Iraqi government made through the OFFP.

## SIEMENS' HISTORICAL FAILURE TO MAINTAIN SUFFICIENT INTERNAL ANTI-CORRUPTION CONTROLS

*Pre-1999*

35.     By the late nineteenth century, SIEMENS and its subsidiaries had become known as an international company, with over half of their employees outside of Germany.  After World War II, with most of its facilities destroyed, its material assets and trademark patents confiscated, and its business prospects in the developed world weakened, SIEMENS began to focus on

developing markets.  By the mid-1950s, SIEMENS was handling major infrastructure projects in South America, the Middle East, and Africa.  By the mid-1990s, SIEMENS became the first foreign corporation to have a holding company in China.

36.     Until in or about February 1999, SIEMENS operated in a largely unregulated environment with respect to international business practices, in which (a) German law did not prohibit overseas bribery and permitted tax deductions for bribe payments to foreign officials; (b) SIEMENS was not yet listed on the NYSE; and (c) SIEMENS operated in many countries where corruption was endemic.

37.     Until in or about February 1999, SIEMENS' project cost calculation sheets sometimes reflected "nützliche aufwendungen" ("NAs"), a common tax term literally translated as "useful expenditures" but partly understood by many SIEMENS employees to mean "bribes."

38.     Until in or about February 1999, certain systems existed within SIEMENS that allowed for corrupt payments as necessary to win business.  For example, there were multiple "cash desks" housed within SIEMENS offices where employees could withdraw large sums of cash, up to and including one million Euros at a time.  In addition, in the 1990s, very large sums of money – more than one billion Euros – were withdrawn for questionable business purposes from off-books accounts in Austria, Switzerland, Liechtenstein, and elsewhere.  SIEMENS also relied heavily on purported "business consultants," in many cases for the sole purpose of passing along corrupt payments from SIEMENS to foreign government officials responsible for awarding business.

*1999 - 2004*

39.     Over the period from in or about February 1999 to in or about July 2004, certain SIEMENS ZV members became aware of changes in the regulatory environment.  While foreign

anti-corruption circulars and policies were promulgated, that "paper program" was largely

ineffective at changing SIEMENS' historical, pervasive corrupt business practices.

40.     On or about February 15, 1999, the German law implementing the OECD

Convention on Combating Bribery of Foreign Public Officials in International Business

Transactions (the "OECD Convention"), which generally required signatory countries to

implement antibribery laws similar to the FCPA, came into force.  On the same day, Officer A

made a presentation at a high-level SIEMENS executive meeting expressing "concern at the

number of criminal and other investigations into members of the company," further noting the

new German law prohibiting foreign bribery and that "[a]s the Board could possibly be held

responsible for various offenses, it was important to take protective measures."

41.     In or about March 1999, the SIEMENS ZV issued a Z Circular, a company-wide

policy, reminding employees of the general need to observe laws and regulations.

42.     On or about April 25, 2000, Officer B issued a report to the SIEMENS ZV

recommending the creation of a company-wide list of agents and consultants and a committee to

review these relationships.

43.     On or about April 25, 2000, during the SIEMENS ZV meeting, a debate ensued

regarding whether to promulgate company-wide uniform guidelines for consultants, but meeting

minutes indicate that the SIEMENS ZV rejected the concept of instituting such guidelines due to

"different business practices" in each division.

44.     In or about June 2000, SIEMENS' lawyers sent memoranda to Officer C and a

Supervisory Board member warning of the potential criminal and civil implications of

maintaining off-books accounts for cash payments in light of SIEMENS' upcoming listing on the

NYSE.  Specifically, the memoranda identified "three bank accounts in Switzerland which are

run as trust accounts for SIEMENS AG and for which confiscation was ordered by the Swiss courts."

45.     On or about July 5, 2000, SIEMENS issued a Z Circular requiring operating groups and regional companies to ensure that the following anti-corruption clause would be included in all contracts with agents, consultants, brokers, or other third parties:  "The agent shall strictly comply with all laws and regulations regarding the performance of the activities applicable to the agent.  Without limitation, the Agent agrees to comply with the requirements of the anticorruption laws applicable to the Parties."

46.     In or about September 2000, Officer B forwarded to Officer C a letter regarding a foreign public prosecutor's investigation into bribes to a former Nigerian dictator allegedly paid from SIEMENS' off-books accounts.  Officer B's handwritten note on the letter said "for info – particulars verbally."

47.     On or about September 12, 2000, in connection with an investigation, Austrian authorities froze assets in at least one Austrian bank account used by SIEMENS.  On or about February 7, 2001, in connection with the Nigeria investigation, an Austrian judge granted a Swiss prosecutor's request for judicial assistance concerning that account and another off-books Austrian bank account used by SIEMENS for improper payments.

48.     On or about March 12, 2001, SIEMENS became listed on the NYSE.  At the time of listing, SIEMENS and its subsidiaries had over 400,000 employees and operated in 190 countries.

49.     On or about July 18, 2001, SIEMENS issued Business Conduct Guidelines that included the following anti-corruption provision:  "No employee may directly or indirectly offer or grant unjustified advantages to others in connection with business dealings, neither in

monetary form nor as some other advantage." The guidelines also provided that gifts to business partners should "avoid the appearance of bad faith or impropriety," that no gifts should be made to "public officials or other civil servants," and that employees entering into contracts with consultants or agents must see to it that those parties also offered no "unjustified advantages."

50.     In or about July 2001, SIEMENS established a new position for a Corporate Officer for Compliance and expanded the existing antitrust compliance system to cover anti-corruption issues. The Corporate Officer for Compliance worked on compliance issues part-time due to other job duties and, until 2004, had a staff of only two lawyers.

51.     On or about October 18, 2001 – nearly seven months after SIEMENS became an issuer – the Swiss off-books accounts were still active, despite knowledge by certain individuals at the highest levels of SIEMENS of the legal concerns surrounding these accounts raised in or about June 2000.

52.     On or about October 18, 2001, Officer A testified about the Swiss off-books accounts before a German parliamentary committee investigating donations to a political party. Officer A confirmed the existence of the accounts and testified that they were not used for cash payments to German political parties, but rather for business consultant commissions in foreign countries.

53.     On or about June 13, 2002, SIEMENS issued principles and recommendations, but not mandatory policies, regarding business-related internal controls and agreements with business consultants, including that such agreements should be in writing, transparent, and as detailed as possible. These non-binding recommendations were largely ineffective. They contained no discussion of how to conduct due diligence on consultants or agents, and although SIEMENS employees often reduced consulting agreements to writing, they frequently did so

only after SIEMENS won a contract and needed documentary support for a payment.  Many written consulting agreements were form agreements containing no substance particular to the engagement, and most called for success fee payments.

54.     In or about July 2003, *The Financial Times* reported that the Milan, Italy public prosecutor's office was investigating payments by SIEMENS to managers of the Italian energy company, Enel.  The Milan investigation focused on €6 million in bribes that PG managers had arranged to be paid to managers of Enel so that PG could win two power plant projects.  The payments to the Enel managers were routed through slush funds in Liechtenstein and through an account at Emirates Bank.

55.      In or about July 2003, the Darmstadt, Germany public prosecutor's office also publicly announced an investigation into the Enel matter.

56.     In or about August 2003, SIEMENS engaged a U.S. law firm for advice on how to respond to the Enel cases.

57.     On or about September 9, 2003, the U.S. law firm submitted to SIEMENS a memorandum, received by several SIEMENS ZV members including Officer A, Officer C, Officer D, and Officer E, concluding that there was an "ample basis for either the [Securities and Exchange Commission] or [Department of Justice] to start at least an informal investigation of a company's role in such a matter."  In addition, the U.S. law firm informed SIEMENS that U.S. enforcement officials would expect an internal investigation to be carried out on behalf of senior management and SIEMENS ZV.  Finally, the U.S. law firm suggested that SIEMENS immediately review and assure proper functioning of its FCPA compliance program, report on those findings to the SIEMENS ZV, and discipline the employees involved in wrongdoing.

58.     On or about September 30, 2003, SIEMENS engaged a local law firm in Erlangen, Germany to investigate some of the facts underlying the Enel allegations.

59.     In or about October 2003, SIEMENS' outside auditors discovered that €4,120,000 in cash had been brought to Nigeria by COM personnel and flagged the issue for additional review.  A SIEMENS compliance lawyer conducted a one-day investigation and wrote a report warning of numerous possible violations of German law, including antibribery laws, in connection with cash payments to purported business consultants.  Officer C received the report, which identified as playing prominently in the scheme several COM employees later arrested by the Munich public prosecutor's office in 2006.  Further, the compliance lawyer's report indicated that based on interviews with employees, the issue investigated was not an isolated incident. Officer C asked the CFO of COM to take care of the problem, but no follow-up was conducted on whether any action was taken.  The report itself was not circulated to the Vorstand as a whole or to the Audit Committee, and the employees involved were not disciplined.

60.     In or about November 2003, to comply with the Sarbanes-Oxley Act of 2002, SIEMENS issued a Code of Ethics for Financial Matters, which, among other things, required Chief Financial Officers and business heads to act responsibly and with integrity.

61.     In or about November 2003, at a meeting of SIEMENS financial officers, Officer C reported on "unpleasant topics regarding Business Conduct which emerged in the past weeks of the Financial Statement," and reminded the financial officers of their duties to adhere to the Business Conduct Guidelines.

62.     In or about November 2003, a compliance lawyer, at Officer B's request, wrote a memorandum describing the standards for an effective compliance organization under both

German and United States law, and highlighting deficiencies in SIEMENS' compliance organization.

63.     In or about November 2003, Officer B forwarded to Officer C the memorandum outlining deficiencies in SIEMENS' compliance organization, with a request to circulate the memorandum to other members of the SIEMENS ZV.  The subject of compliance was taken off the agenda for the SIEMENS ZV meeting that immediately followed the drafting of the memorandum, and was also not discussed at the subsequent SIEMENS ZV meeting in or about December 2003.

64.     From in or about February 1999 to in or about July 2004, notwithstanding the promulgation of some written policies, SIEMENS senior management provided little corresponding guidance on how to conduct business lawfully in countries where SIEMENS had been paying bribes historically.  The SIEMENS ZV provided few strong messages regarding anti-corruption.  Senior management made no clear statement that SIEMENS would rather lose business than obtain it illegally, and employees were still under tremendous pressure to meet their sales goals.

*2004 - 2006*

65.     From in or about mid-2004 to in or about 2006, the SIEMENS ZV grew increasingly alarmed at developments in the Enel corruption cases and adopted more robust – but still imperfect – compliance measures in response.  Certain SIEMENS ZV members began to recognize the serious legal risks in both the United States and Europe that SIEMENS faced for bribery.

66.     On or about April 24, 2004, the Milan, Italy investigating judge issued a written opinion stating that the evidence in the Enel case indicated that SIEMENS, as a company, saw

bribery "at least as a possible business strategy."  The judge further opined that the existence of

the Liechtenstein and Emirates Bank accounts had been "disguised deliberately" and that such

conduct "creates the danger that cases of corruption will recur."  Finally, the judge noted that

SIEMENS was not cooperating with the investigation, as evidenced by its concealment of the

accounts.

67.     On or about May 4, 2004, several members of the SIEMENS ZV, including

Officer A, Officer C, Officer D, Officer E, and Officer F received a memorandum outlining the

Milan, Italy investigating judge's ruling.

68.     On or about June 1, 2004, the Erlangen law firm SIEMENS engaged to

investigate the Enel matter issued the first report of its findings to Officer B, who shared the

report with Officer A, Officer C, and Officer D.  The report discussed the Milan prosecutor's

allegations that various SIEMENS employees had paid bribes to Enel officials through purported

business consultants.  In the report, the Erlangen law firm indicated that several key SIEMENS

employees had refused to submit to interviews.  None of these key SIEMENS employees was

ever disciplined as a result of the failure to submit to interviews by SIEMENS' Erlangen lawyer

regarding the Enel corruption allegations.

69.     In or about July 2004, Officer C delivered a speech to the SIEMENS ZV and

high-level business managers entitled "Tone from the Top," which was the first time a member

of SIEMENS ZV strongly and directly sent a message to a large group of employees that

corruption would not be tolerated and was contrary to SIEMENS' principles of integrity.  In this

speech, Officer C proposed that in order to impose more control over consulting agreements and

"off set the[ir] danger," such agreements should be reviewed and signed by the chairmen of the

divisional boards.  Officer C also suggested implementing more stringent disciplinary penalties

for employees who violate internal controls and fail to cooperate with investigations.  He explained that in U.S. companies, "whenever employees refuse to cooperate with the authorities, they are immediately dismissed irrespective of their position on the corporate ladder."

70.    On or about August 4, 2004, SIEMENS promulgated its first Company-wide, comprehensive policy on the use of bank accounts and external payment orders.  The policy, among other things, restricted the use of bank accounts controlled by SIEMENS employees or third parties, a mechanism that had previously been heavily used by certain operating groups, particularly COM, to make improper payments on behalf of SIEMENS.

71.    On or about September 7, 2004, Officer C sent an email to SIEMENS ZV members Officer A and Officer E stating that divisional chairmen did not consider his July 2004 compliance speech as mandatory and requesting a Z Circular regarding agreements with business consultants.

72.    On or about November 4, 2004, the Erlangen law firm SIEMENS engaged to investigate the Enel case issued its second report, and the full SIEMENS ZV received a briefing about the contents of the report.  The report highlighted questionable payments from SIEMENS to a Dubai-based business consultant and to certain off-books accounts in Liechtenstein.

73.    On or about November 5, 2004, the SIEMENS ZV received a written report identifying by name the Dubai-based purported business consultant as the conduit for the payments through Emirates Bank in the Enel matter.  Nevertheless, no action was taken to investigate the broader implications of this report.

74.    On or about January 26, 2005, at an Audit Committee meeting in which the Enel case was discussed, a member of the Audit Committee asked Officer C "whether pointers could be drawn from this regarding gaps in the internal control system."  In response, Officer C said

"the existing rules were comprehensive and clearly written down," despite the fact that he and other senior executives were aware by that time of significant control weaknesses.

75.     On or about April 25, 2005, at an Audit Committee meeting in which the off-books accounts in Liechtenstein were mentioned, a member of the Audit committee asked Officer C whether "an inference might be drawn from existing knowledge that cash deposits might exist outside Siemens AG."  Despite his knowledge that such cash deposits did exist, Officer C replied that "no indication existed of any [such] accounts which may be attributable to the company and in the case that any such indication existed, the company would look into this."

76.     On or about May 4, 2005, the Erlangen law firm engaged by SIEMENS to investigate the Enel case issued the final report of its findings to several SIEMENS ZV members.

77.     On or about May 31, 2005, the full SIEMENS ZV learned at a meeting that the final report of the Enel investigation submitted by the Erlangen lawyer had discovered 126 payments totaling €190 million to Liechtenstein accounts from 1997 to 1999 for which recipients could not be identified.  At the same meeting, SIEMENS ZV received a report that Liechtenstein authorities were investigating a former ICN employee accused of siphoning money from SIEMENS through sham consulting agreements.  The report identified five off-books accounts in Liechtenstein that were seized.  Despite striking similarities between the facts of the two reports, SIEMENS ZV members took no action to investigate the payments or accounts further. Similarly, SIEMENS ZV made no attempt to determine whether the former ICN employee had in fact embezzled company money.  At the same SIEMENS ZV meeting, Officer B included the following statements in his presentation:

>       The most important thing in each Compliance programme is the
>       absolute commitment of management:  Adherence to the laws is
>       for us the most important commandment.   Offences are not

> tolerated and are punished consistently and without exception. *In the Enel case, the investigating Frankfurt chief prosecutor said to a counsel for the defence of the former Siemens employees that he considered the Siemens Compliance programme to exist only on paper.*

(Emphasis added.)

78.     On or about July 27, 2005, Officer B made a presentation to the Audit Committee, during which he told the Audit Committee that "an investigation by an external [accountant] of unclarified payments to a bank in Liechtenstein had become necessary.  This has revealed that the recipient of 126 payments totaling EUR 190 million in 1997 to 1999 could not be identified."  Officer B said the information had been given to the auditors and that [two] Z Circulars . . . had added new rules on external payments and bank accounts, which would make it possible in the future to identify payment recipients.  During the same meeting, Officer B included in his presentation statements regarding the compliance and adherence to the laws that were identical to those he had made at the May 31, 2005 SIEMENS ZV meeting, but he removed the final sentence regarding the Frankfurt prosecutor's statement that SIEMENS' compliance program existed only on paper.

79.     On or about July 26, 2005, the Corporate Compliance Office, at Officer G's request, completed a written benchmarking analysis comparing SIEMENS' compliance program and infrastructure with that of General Electric Company ("GE").  The analysis, which was distributed to Officer E and Officer G, showed serious deficiencies in SIEMENS' resourcing and infrastructure when compared to GE's.  In particular, the analysis noted, "[t]he Compliance Office team is extremely small (six lawyers) in relation to the number of employees, and understaffed in comparison with GE," which had 300 "ombudsmen."  The memorandum further pointed out that GE's program "seem[ed] more efficient than SIEMENS' at diffusing

Compliance principles throughout the entire company." SIEMENS took no action to augment compliance resources in response to the benchmarking memorandum apart from Officer G ordering an audit of the compliance organization, which remained in draft form until as late as November 2006.

80.     In or about July 2005, SIEMENS redistributed the Business Conduct Guidelines, with a new foreword by Officer G.

81.     On or about June 29, 2005 – nine months after Officer C's email request for consulting agreement guidelines – SIEMENS enacted a Z Circular containing mandatory guidelines regarding agreements with business consultants.  The guidelines prohibited success fees and required relevant compliance officers to sign off on consulting agreements and attached a due diligence questionnaire.

82.     On or about November 23, 2005, in his report to the SIEMENS ZV, Officer B commented on the lack of effectiveness of the Regional Compliance Officers.  Officer B noted that when SIEMENS attempted to collect business consulting agreements from the regions after the June 29, 2005 Z Circular, most Regional Compliance Officers had reported that "either such agreements [did] not exist, or that the possible infringements of the laws of the Business Conduct Guidelines [were] not visible."  Officer B went on to comment that "[t]aking into account the known business environments in, for example, the Asiatic territories, the correctness of this statement [had] to be questioned.  It also [shed] some doubt as to the quality of the [Regional Compliance Officers]."  Notwithstanding Officer B's explicit doubts that existing consulting agreements had been produced by regions as requested, there was no follow-up to seek the missing documents.

83.     On or about December 7, 2005, during his presentation to the Audit Committee, Officer B made no mention of the questions he had raised at the November 23, 2005 SIEMENS ZV meeting regarding the Regional Compliance Officers' quality and their truthfulness in reporting on the status of business consulting agreements.

84.     In or about March 2006, in the course of a compliance investigation, a SIEMENS Greece COM manager admitted to the Corporate Compliance Office and Internal Audit that he had received substantial funds to make "bonus payments" to managers at the Greek national telephone company, OTE.  Neither the SIEMENS ZV nor the Corporate Compliance Office undertook a comprehensive investigation aimed at discovering the full extent of corruption in Greece or in the COM business more broadly.

85.     In or about April 2006, in response to a special audit request by Intercom's board of directors, SIEMENS' outside auditors reported at least 250 suspicious payments made through Intercom to companies in foreign jurisdictions on behalf of COM ICM and SIEMENS' Italian subsidiary.  The audit report was provided to the board of directors of Intercom, as well as to certain members of the SIEMENS ZV and the Corporate Compliance Office.  Neither the SIEMENS ZV nor the Corporate Compliance Office made any attempt to investigate these facts, or explore whether they were related to other similar instances of wrongdoing.

86.     From in or about 2004 to in or about 2006, in addition to learning of the corruption issues involving SIEMENS in Nigeria, Italy, Greece, Liechtenstein, and elsewhere, SIEMENS' senior management became aware of government investigations into corruption by SIEMENS in Israel, Hungary, Azerbaijan, Taiwan, and China.  Nevertheless, SIEMENS ZV members and other senior management failed to adequately investigate or follow up on any of these issues.  SIEMENS ZV also failed to take effective disciplinary measures with respect to

any of the employees implicated in the various investigations.  For example, the three PG managers implicated in the Enel cases each received a severance package standard for early retirees, despite the fact that certain SIEMENS ZV members knew that at least two of the PG managers had already admitted to paying bribes at the time of their retirement.

87.     From in or about 2004 to in or about 2006, the Corporate Compliance Office continued to lack resources, and there was an inherent conflict in its mandate, which included both defending the company against prosecutorial investigations and preventing and punishing compliance breaches.  In addition, there were extremely limited internal audit resources to support compliance efforts.  All of these factors undermined the improved policies because violations were difficult to detect and remedy, and resources were insufficient to train business people in anti-corruption compliance.

88.     From in or about 2004 to in or about 2006, there was a consistent failure on the part of certain members of management to alert the Audit Committee to the significance of the compliance failures discovered within SIEMENS.  Reports to the Audit Committee by the Chief Compliance Officer were principally status reports on prosecutorial investigations and often conveyed incomplete information.  In some instances, management provided inaccurate information in response to Audit Committee inquiries.  At no time did management convey to the Audit Committee a sense of alarm or growing crisis.

### SIEMENS' SYSTEMATIC EFFORTS TO CIRCUMVENT INTERNAL CONTROLS AND FALSIFY BOOKS AND RECORDS

89.     From in or about the mid-1990s to in or about 2007, SIEMENS engaged in systematic efforts to falsify its corporate books and records and circumvent existing internal controls.  These systematic efforts included, but were not limited to:  (a) using off-books

accounts for corrupt payments even after compliance risks associated with such accounts were raised at the highest levels of management; (b) entering into purported business consulting agreements with no basis, sometimes after SIEMENS had won the relevant project; (c) engaging former SIEMENS employees as purported business consultants to act as conduits for corrupt payments to government officials; (d) justifying payments to purported business consultants based on false invoices; (e) mischaracterizing corrupt payments in the corporate books and records as consulting fees and other seemingly legitimate expenses; (f) limiting the quantity and scope of audits of payments to purported business consultants; (g) accumulating profit reserves as liabilities in internal balance sheet accounts and then using them to make corrupt payments through business consultants as needed; (h) using removable Post-It notes to affix signatures on approval forms authorizing payments to conceal the identity of the signors and obscure the audit trail; (i) allowing third party payments to be made based on a single signature in contravention of SIEMENS' "four eyes principle," which required authorization of payments by two SIEMENS managers; (j) drafting and backdating sham business consulting agreements to justify third party payments; and (k) changing the name of purported business consulting agreements to "agency agreements" or similar titles to avoid detection and conceal noncompliance with the 2005 business consulting agreement guidelines.

90.    In addition, from on or about March 12, 2001 to in or about 2007, SIEMENS made payments totaling approximately $1,360,000,000 through various mechanisms.  Of this amount, approximately $554,500,000 was paid for unknown purposes, including approximately $341,000,000 constituting direct payments to business consultants.  The remaining $805,500,000 of this amount was intended in whole or in part as corrupt payments to foreign officials through the following payment mechanisms, among others:

a.      <u>Direct payments to business consultants</u>:  COM, MED, PG, PTD, TS, I&S, and various SIEMENS regional companies made payments directly to purported business consultants, knowing that at least some or all of those funds would be passed along to foreign government officials.  From on or about March 12, 2001 to on or about November 15, 2006, COM, MED, PG, PTD, TS, I&S, and various SIEMENS regional companies made approximately $183,400,000 in direct payments to business consultants.  Thereafter, those groups and companies made another $6,300,000 in direct payments to purported business consultants.

b.      <u>Cash desks</u>:  SIEMENS maintained three cash desks within SIEMENS' offices where COM employees withdrew large sums of cash for corrupt payments.  COM employees typically brought empty suitcases to fill with the cash received from the cash desks.  The same managers who submitted the requests for the cash were able to authorize the cash pick-ups.  From on or about March 12, 2001 to on or about September 2004, COM employees withdrew approximately $66,600,000 predominantly from cash desks operated by Siemens Real Estate.  Thereafter, an additional $500,000 was paid out in cash until November 2005, when the last cash desk was closed.

c.      <u>Barschecks</u>:  Until approximately March 2002, COM's Accounting department wrote special checks called "Barschecks" to two former COM managers, who deposited these cash equivalents in Austrian off-books accounts.  The two former COM managers then transferred corrupt payments intended in whole or in part for foreign government officials from the off-books accounts to purported business consultants.  COM stopped using the Barschecks system from in or about September 2000 to in or about March 2002, the period in which the Austrian off-books accounts were seized by the Austrian public prosecutor's office.

On or about March 21, 2002, COM issued approximately $1,500,000 in Barschecks to the two former COM managers.

        d.    <u>Bearer checks</u>:  Beginning in or about September 2000 and continuing until approximately September 2003, COM authorized its bank in Germany to issue bearer checks to two former COM managers, who then deposited these cash equivalents into off-books accounts. The two former COM managers then transferred corrupt payments from the off-books accounts to purported business consultants.  The bearer checks system was established in large part to replace the barschecks system.  From on or about March 12, 2001 to on or about September 2002, COM authorized approximately $80,500,000 in bearer checks to the two former COM managers.  Thereafter, COM authorized an additional $1,900,000 in bearer checks to the two former COM managers.

        e.    <u>Payment intermediaries</u>:  COM, MED, PG, PTD, and TS entered into agreements with intermediary entities for the sole purpose of transferring money from SIEMENS to purported business consultants, who then used some or all of the money to pay bribes to government officials. The payment intermediaries sent sham invoices to SIEMENS to trigger payments for certain projects, then kept a percentage of the payments for themselves and passed along the rest to purported business consultants.  COM, MED, PG, PTD, and TS utilized this mechanism to further conceal the end recipients of the funds in SIEMENS' books and records. From on or about March 12, 2001 to on or about November 15, 2006, COM, MED, PG, PTD, and TS paid approximately $185,400,000 to payment intermediaries.  Thereafter, COM, MED, PG, PTD, and TS paid an additional $2,700,000 to payment intermediaries.  Although SIEMENS used thousands of business consultants, it used less than a dozen intermediaries.  Intermediaries, unlike business consultants, did not interface directly with the end recipients of the payments.

f.      Slush funds:  Until approximately September 2004, COM, PG, PTD, and a SIEMENS regional company in South America created "slush funds" controlled by non-SIEMENS "trustees" and SIEMENS managers at off-shore banks.  COM, PG, PTD, and the regional company in South America used the slush funds to generate cash for corrupt payments.  Slush funds differed from payment intermediaries in that funds were often pooled gradually rather than through project-specific invoices.  From on or about March 12, 2001 to on or about September 2004, COM, PG, PTD, and the regional company in South America paid approximately $192,600,000 to third parties through the slush funds.  Thereafter, COM, PG, PTD, and the regional company in South America paid approximately $1,900,000 to third parties through the slush funds.

g.      Confidential payment system:  PG utilized a confidential payment system that was outside the normal accounts payable process and that facilitated corrupt payments without invoices.  There was no evidence of the payments in the accounts payable detail, thereby obscuring the audit trail, providing flexibility regarding which project to charge for the payments, and eliminating any record in the project accounting of the exact purposes of the payments.  From on or about March 12, 2001 to on or about November 15, 2006, PG paid approximately $36,500,000 to purported business consultants and agents using the confidential payment system.

h.      Internal Commission Accounts:  Until approximately July 2005, MED and various regional companies created pools of funds for corrupt payments in balance sheet accounts called internal commission accounts.  MED and the regional companies reserved percentages of the customer prices from certain projects and allocated them to the internal commission accounts as liabilities.  The funds were then used for various purposes, including by

26

purported business consultants for corrupt payments.  From on or about March 12, 2001 to in or about 2007, MED and the various regional companies paid approximately $12,600,000 to purported business consultants through the internal commission accounts.

        i.     <u>Other Mechanisms</u>:  From on or about March 12, 2001 to in or about 2007, SIEMENS entities paid approximately $33,100,000 through other mechanisms including sham supplier agreements, sham resale transactions, receivables manipulation, and others.  Part or all of that amount was intended as corrupt payments to foreign officials.

       91.     The payments described in paragraphs 90(a) though 90(i) are summarized in the chart below:

| Payment Mechanism | SIEMENS Entities that Employed Mechanism | Amount of Corrupt Payments Paid Through Mechanism After March 12, 2001 |
|---|---|---|
| Direct Payments to Business Consultants | COM, MED, PG, PTD, TS, I&S, various regional companies | $189,700,000 |
| Cash Desks | COM | $67,100,000 |
| Barschecks | COM | $1,500,000 |
| Bearer Checks | COM | $82,400,000 |
| Payment Intermediaries | COM, MED, PG, PTD, TS | $188,100,000 |
| Slush Funds | COM, PG, PTD, various regional companies | $194,500,000 |
| Confidential Payment System | PG | $36,500,000 |
| Internal Commission Accounts | MED, various regional companies | $12,600,000 |
| Corrupt Payments through other methods | Various SIEMENS entities | $33,100,000 |
| Total corrupt payments paid through all of the above mechanisms | COM, MED, PG, PTD, I&S, TS, and various regional companies | $805,500,000 |

## THE UNITED NATIONS OIL FOR FOOD PROGRAM

92.     On or about August 6, 1990, days after Iraq's invasion of Kuwait, the United

Nations ("U.N.") adopted Security Council Resolution 661, which prohibited U.N. member-

states from transacting business with Iraq, except for the purchase and sale of humanitarian

supplies.  Resolution 661 prohibited virtually all direct financial transactions with the

government of Iraq.

93.     On or about April 15, 1995, the U.N. adopted Security Council Resolution 986,

which served as a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its

oil.  However, Resolution 986 required that the proceeds from oil sales be used by the Iraqi

government to purchase humanitarian supplies, including but not limited to food, for the Iraqi

people.  Hence, this program became known as the Oil for Food Program ("OFFP").  Payments

made to the Iraqi government that were not approved by the U.N. and that were outside the strict

contours of the OFFP were prohibited.

94.     The rules of the OFFP required that the proceeds from all sales of Iraqi oil be

deposited into a U.N.-controlled escrow account at the New York, New York, branch of Banque

Nationale de Paris ("BNP-Paribas").  That escrow account funded the purchase of humanitarian

goods by the Iraqi government.

95.     Under the rules of the OFFP, a supplier of humanitarian goods contracted with a

ministry or other department of the Iraqi government to sell goods to the government.  Once that

contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee")

which reviewed the contracts to ensure that their terms complied with all OFFP and Iraqi

sanction regulations.  The 661 Committee accepted the contracts, rejected them, or asked the

supplier to provide additional information upon which the committee could make a decision.

96.     If a contract was approved by the 661 Committee, a letter of credit was issued by BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor based in Geneva, Switzerland, that provided inspection services in Iraq on behalf of the U.N.  Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

97.     On or about December 10, 1996, the first Iraqi oil exports under the OFFP began. The OFFP continued from in or about December 1996 until the United States' invasion of Iraq on or about March 19, 2003.  From in or about December 1996 through March 2003, the United States government prohibited United States companies, including their foreign branches, and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP.

98.     Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government.  These kickbacks violated OFFP regulations and U.N. sanctions, which prohibited payments to the Iraqi government that were not expressly approved by the U.N. and that were not contemplated by the guidelines of the OFFP.

99.     Often, these kickbacks were termed "after sales service fees" ("ASSFs"), but did not represent any actual service being performed by the supplier.  These ASSFs were usually included in the contract price submitted by the supplier to the U.N. without disclosing to the U.N. that the contract contained an extra 10% which would be returned to the Iraqi government.

Including the 10% in the contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N. to fund the kickbacks to the Iraqi government.

100.    Some suppliers labeled the ASSFs as such, thereby leading the U.N. to believe that actual after-sales services were being provided by the supplier.  Other suppliers disguised the ASSFs by inserting fictitious line items into the contracts for goods or services that were not being provided.  Still other suppliers simply offered or accepted contract prices inflated by 10% to account for the payments they would make, or cause to be made, to the Iraqi government.

*SIEMENS' OFFP Kickback Payments*

101.    From in or about 2000 to in or about 2002, Siemens France, Siemens Turkey, Osram Middle East, and GTT, each wholly owned by SIEMENS or one of its subsidiaries, were awarded 42 contracts with a combined value of more than $80,000,000 with the Ministries of Electricity and Oil of the Government of the Republic of Iraq under the OFFP.  To obtain these contracts, at the demand of these ministries, the relevant Siemens entities caused to be paid as much as $1,736,076 in kickbacks to the Iraqi government, and they collectively earned a gross profit of over $38,000,000.

102.    In order to generate the funds to pay the kickbacks to the Iraqi government and to conceal those payments, the Siemens entities inflated the price of some contracts by up to 10% before submitting them to the 661 Committee and the U.N. for approval.

103.    In most cases, after the U.N. approved the Siemens France, Siemens Turkey, and Osram Middle East contracts, BNP-Paribas issued letters of credit, via international wire communications, to banks used by Siemens France, Siemens Turkey, and Osram Middle East.  These letters of credit authorized Siemens France, Siemens Turkey, and Osram Middle East to be paid the contracted amounts, which included the kickbacks to be paid to the Iraqi government.

In connection with one of the Siemens Turkey contracts and all of the GTT contracts, which were not performed until after the war began in 2003, the U.N. requested that Siemens Turkey and GTT reduce the contract amounts by 10% to eliminate the ASSFs promised to the Iraqi government.  Siemens Turkey and GTT ultimately complied with the U.N.'s requests with respect to those contracts, though they had already caused kickbacks to be paid to the Iraqi government.

*Siemens France Contracts*

104.    From in or about January 2000 to in or about April 2001, Siemens France, in partnership with PG and PTD, entered into at least twelve contracts with the Iraqi Ministry of Electricity ("Ministry of Electricity") to provide power station renovation, servicing, and spare parts.  At the demand of the Ministry, Siemens France caused a kickback to be paid to the Iraqi government on each contract.  In connection with the Siemens France OFFP contracts, PG engaged OFFP Agent A as the agent on each of these contracts.

105.    Between in or about November 2000 and in or about January 2001, several PG operational managers had a meeting to discuss how to fund and pay the 10% kickback required by the Iraqi government on the OFFP contracts.

106.    In or about March 2001, a PG employee wrote a memorandum regarding how to secure the 10% "after sales service ch."  The memorandum reported a statement by an employee of OFFP Agent A that Siemens Turkey paid this amount partially in cash "so that no names appear on paper."

107.    In or about March and April 2001, a now-deceased PG employee met with two representatives of the Ministry of Electricity and wrote memoranda summarizing the meetings. The memoranda indicated that the Ministry of Electricity representatives informed him that the

Iraqi government would from then on require a guarantee of 10% of the contract value to be paid

to the relevant Iraqi government customer before the Central Bank of Iraq would authorize a

letter of credit to be issued for the contract.  One of the Ministry of Electricity representatives

referred to the 10% guarantee as an "after sales service" payment.  The PG employee's

memoranda expressed his concern as to the permissibility of the payments under the OFFP rules

and indicated he would relay the information to his supervisors for their review.

108.    In or about 2001, in connection with at least one OFFP contract, PG signed a

supplemental agreement with OFFP Agent A providing for a payment of 10% of the contract

value for "after sales services" to cover the kickback payment.

109.    On each contract, on behalf of Siemens France, OFFP Agent A deposited the 10%

kickback into a Jordanian bank account held by two Iraqi officials, whereupon such officials

transferred the funds into a Jordanian bank account held by the Ministry of Electricity.  OFFP

Agent A, using the name of an acquaintance who did not work for OFFP Agent A to conceal its

identity, made the deposits in cash into the account of the Ministry of Electricity.  When the

funds were transferred to the Ministry of Electricity's account, OFFP Agent A received

documentary confirmation from the Jordanian bank that the "after sales services fees" had been

paid.

110.    Siemens France caused a total of at least $321,745 in kickbacks to be paid to the

Iraqi government in connection with Siemens France OFFP contracts.

111.    After OFFP Agent A made the kickback payments, PG reimbursed OFFP Agent

A for the kickbacks based on sham invoices for commissions prepared by OFFP Agent A.

112.    In or about 2000 and 2001, in order to conceal on its corporate books and records

the kickback payments made to the Iraqi government, Siemens France and PG improperly

characterized payments to OFFP Agent A, part of which were paid as kickbacks to the Iraqi government, as commissions to OFFP Agent A.

113.    At the end of SIEMENS' fiscal years 2001 and 2002, the books and records of Siemens entities involved in the Siemens France contracts, including those containing false characterizations of the kickbacks paid to the Iraqi government, were incorporated into the books and records of SIEMENS for purposes of preparing SIEMENS' year-end financial statements.

*Siemens Turkey Contracts*

114.    From in or about September 2000 to in or about June 2002, Siemens Turkey entered into at least twenty contracts to provide power and electrical equipment to the Ministry of Electricity.  On each contract, Siemens Turkey caused a kickback to be paid to the Iraqi government.  Prior to the OFFP, Siemens Turkey had not conducted business in Iraq.  Because PG had a relationship with OFFP Agent A for work in Iraq, Siemens Turkey engaged OFFP Agent A as an agent for its OFFP contracts as well.

115.    For each of its contracts, Siemens Turkey caused OFFP Agent A to deposit the 10% kickback into a Jordanian bank account held by two Iraqi officials, whereupon such officials transferred the funds into a Jordanian bank account held by the Ministry of Electricity. OFFP Agent A, using the name of an acquaintance who did not work for OFFP Agent A to conceal its identity, made the deposits in cash into the account of the Ministry of Electricity. When the funds were transferred to the Ministry of Electricity's account, OFFP Agent A received documentary confirmation from the Jordanian bank that the "after sales services fees" had been paid.

116.    Siemens Turkey caused a total of at least $1,243,119 in kickbacks to be paid to the Iraqi government in connection with its OFFP contracts.

117.     After OFFP Agent A made the kickback payments, Siemens Turkey reimbursed OFFP Agent A for the kickbacks based on sham invoices for commissions prepared by OFFP Agent A.

118.     From in or about 2000 to in or about 2002, in order to conceal on its corporate books and records the kickback payments made to the Iraqi government, Siemens Turkey improperly characterized payments to OFFP Agent A, part of which were paid as kickbacks to the Iraqi government, as commissions to OFFP Agent A.

119.     At the end of SIEMENS' fiscal years 2000 through 2002, the books and records of Siemens Turkey, including those containing false characterizations of the kickbacks paid to the Iraqi government, were incorporated into the books and records of SIEMENS for purposes of preparing SIEMENS' year-end financial statements.

*Osram Middle East Contracts*

120.     From in or about February 2000 to in or about June 2002, Osram Middle East entered into at least six contracts to sell lightbulbs and lighting equipment to the Ministry of Oil. On each of the contracts, at the demand of the Ministry, Osram Middle East caused a kickback to be paid to the Iraqi government.  Osram Middle East used OFFP Agent B as its agent and made commission payments to OFFP Agent B of approximately 10% on each of the contracts.  The commission paid to OFFP Agent B included an amount based on a percentage of the contract that Osram Middle East employees understood to be a kickback payment required by the Iraqi government.

121.     In connection with at least three of the contracts, Osram Middle East delivered side letters to the Ministry of Oil in which it promised to provide the Ministry of Oil with a "letter of credit" or "irrevocable bank guarantee" for a specified sum equivalent to approximately

10% of the contract value.  On the same contracts, an amount covering the specified sum was incorporated into the contract price.

122.    For each contract, Osram Middle East caused OFFP Agent B to wire transfer the 10% kickback payment from his own account into a Jordanian bank account held by the Ministry of Oil.

123.    Osram Middle East caused a total of at least $89,250 in kickbacks to be paid to the Iraqi government in connection with its OFFP contracts.

124.    By paying OFFP Agent B his "commission" on the OFFP contracts, Osram Middle East reimbursed OFFP Agent B for the kickbacks it had paid to the Iraqi government.

125.    From in or about 2000 to in or about 2002, in order to conceal on its corporate books and records the kickback payments to the Iraqi government, Osram Middle East improperly characterized payments to OFFP Agent B, part of which were paid as kickbacks to the Iraqi government, as commissions to OFFP Agent B.

126.    At the end of SIEMENS' fiscal years 2000 through 2002, the books and records of Osram Middle East, including those containing false characterizations of the kickbacks paid to the Iraqi government, were part of SIEMENS' books and records.

*GTT Contracts*

127.    In or about June 2001, GTT entered into at least four contracts to sell gas turbines and equipment to the Ministry of Electricity.  GTT engaged OFFP Agent C and OFFP Agent D to act as its agents on the OFFP contracts.  On each of the four contracts, at the demand of the Ministry, GTT caused a kickback to be paid to the Iraqi government.

128.    OFFP Agent C informed GTT that they were making payments to the Iraqi government to secure letters of credit for the contracts.  In connection with at least three of the

contracts, GTT documents budget for a 20% commission to either OFFP Agent C or OFFP Agent D.  GTT employees understood that half of that commission, or 10%, was intended to be paid as a kickback to the Iraqi government.

129.     On all four contracts, the U.N. requested that GTT amend the contracts to decrease their value by 10%, representing the removal of the "after sales service" component. Nevertheless, GTT caused some kickback payments to be made on these contracts.

130.     GTT caused a total of at least $81,962 in kickbacks to be paid to the Iraqi government in connection with its OFFP contracts.

131.     By paying OFFP Agent C and OFFP Agent D their "commission" on the OFFP contracts, GTT reimbursed OFFP Agent C and OFFP Agent D for the kickbacks they had paid to the Iraqi government.

132.     In or about 2001, in order to conceal on its corporate books and records the kickback payments to the Iraqi government, GTT improperly characterized payments to OFFP Agent C and OFFP Agent D, part of which were paid as kickbacks to the Iraqi government, as commissions to OFFP Agent C and OFFP Agent D.

133.     In or about fiscal year 2001, the books and records of GTT, including those containing false characterizations of the kickbacks paid to the Iraqi government, were incorporated into the books and records of SIEMENS for purposes of preparing SIEMENS' year-end financial statements.

## COUNT ONE
### (FCPA – Internal Controls)

134.     Paragraphs 1 through 1 through 27 and 35 through 91 of this Information are re-alleged and incorporated by reference as if set out in full.

135.    From on or about March 12, 2001 to in or about at least November 2006, SIEMENS knowingly circumvented and knowingly failed to implement a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general and specific authorization; (ii) transactions were recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles and any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general and specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences, *to wit*: SIEMENS: (a) knowingly failed to implement sufficient antibribery compliance policies and procedures; (b) knowingly failed to implement sufficient controls over third party bank accounts and the use of cash; (c) knowingly failed to appropriately investigate and respond to allegations of corrupt payments; (d) knowingly failed to discipline employees involved in making corrupt payments; (e) knowingly failed to establish a sufficiently empowered and competent Corporate Compliance Office; (f) knowingly failed to report to the Audit Committee substantiated allegations of corrupt payments around the world; (g) limited the quantity and scope of audits of payments to purported business consultants; (h) created and utilized certain mechanisms for making and concealing approximately $1,361,500,000 in payments to third parties; (i) engaged former SIEMENS employees as purported business consultants to act as conduits for corrupt payments; (j) continued to use off-books accounts for corrupt payments even after compliance risks associated with such accounts were raised at the highest levels of management; (k) used removable Post-It notes to affix signatures to approval forms authorizing payments to conceal the identity of the signors and

37

obscure the audit trail; (l) allowed third party payments to be made based on a single signature in contravention of SIEMENS' "four eyes principle," which required authorization of payments by two SIEMENS managers; (m) changed the name of purported business consulting agreements to "agency agreements" or similar titles to avoid detection and conceal noncompliance with the 2005 business consulting agreement guidelines; (n) knowingly failed to exercise due diligence to prevent and detect criminal conduct; (o) knowingly included within substantial authority personnel individuals whom SIEMENS knew had engaged in illegal activities and other conduct inconsistent with an effective compliance and ethics program; (p) knowingly failed to take reasonable steps to ensure SIEMENS' compliance and ethics program was followed, including monitoring and internal audits to detect criminal conduct; (q) knowingly failed to evaluate regularly the effectiveness of SIEMENS' compliance and ethics program; (r) knowingly failed to have and publicize a system whereby employees and agents could report or seek guidance regarding potential or actual criminal conduct without fear of retaliation; (s) knowingly failed to provide appropriate incentives to perform in accordance with the compliance and ethics program; and (t) knowingly entered into purported business consulting agreements with no basis, and without performing any due diligence, sometimes after SIEMENS had won the relevant project.

All in violation of Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a).

## COUNT TWO
### (FCPA – Books and Records)

136.    Paragraphs 1 through 133 of this Information are re-alleged and incorporated by reference as if set out in full.

137.    From on or about March 12, 2001 to in or about at least November 2006, SIEMENS knowingly falsified and caused to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of SIEMENS, *to wit:* SIEMENS (a) used off-books accounts as a way to conceal corrupt payments; (b) entered into purported business consulting agreements with no basis, sometimes after SIEMENS had won the relevant project; (c) justified payments to purported business consultants based on false invoices; (d) mischaracterized bribes in the corporate books and records as consulting fees and other seemingly legitimate expenses; (e) accumulated profit reserves as liabilities in internal balance sheet accounts and then used them to make corrupt payments through business consultants as needed; (f) used removable Post-It notes to affix signatures to approval forms authorizing payments to conceal the identity of the signors and obscure the audit trail; and (g) drafted and backdated sham business consulting agreements to justify third party payments; and (h) falsely described kickbacks paid to the Iraqi government in connection with the Oil for Food Program in its corporate books and records as commission payments to agents when SIEMENS and Siemens France, Siemens Turkey, Osram Middle East and GTT were aware that a substantial portion of these payments was being passed on to the Iraqi government in exchange for being awarded contracts with the Iraqi government.

All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

STEVEN A. TYRRELL
Chief
Fraud Section, Criminal Division


By:            /s/
       Mark F. Mendelsohn
       Deputy Chief
       Fraud Section, Criminal Division
       (202) 514-1721


By:            /s/
       Lori A. Weinstein
       Trial Attorney – Foreign Corrupt Practices Act
       Fraud Section, Criminal Division
       (202) 514-0839

       United States Department of Justice
       1400 New York Avenue, N.W.
       Washington, D.C. 20005

       JEFFREY A. TAYLOR
       United States Attorney


By:            /s/
       John D. Griffith
       Assistant United States Attorney
       Fraud and Public Corruption Section
       (202) 353-2453

       United States Attorney's Office
       555 Fourth Street, NW
       Washington, D.C. 20530