## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | **CRIMINAL NO.:** |
| **SIEMENS AKTIENGESELLSCHAFT,** | : | |
| **SIEMENS S.A. (ARGENTINA),** | : | |
| **SIEMENS BANGLADESH LTD., and** | : | |
| **SIEMENS S.A. (VENEZUELA),** | : | |
| | : | |
| **Defendants** | : | |
| | : | |

## DEPARTMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its counsel, the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney for the District of Columbia (collectively, the "Department"), hereby submits in the above-captioned matters the Department's Sentencing Memorandum.  For the reasons outlined below, the Department respectfully submits that the Court should accept the guilty pleas of Siemens Aktiengesellschaft ("Siemens"), Siemens S.A. (Argentina) ("Siemens Argentina"), Siemens Bangladesh Limited ("Siemens Bangladesh"), and Siemens S.A. (Venezuela) ("Siemens Venezuela"), and sentence them in accordance with the parties' agreement.

### 1.     Background

Siemens is a German engineering company with over 400,000 employees and operations in 191 countries.  Siemens, through its operating groups, subsidiaries, officers, directors, employees, and agents, is engaged in, among other things, developing, constructing, selling, and servicing telecommunications equipment and systems; power generation, transmission, and

distribution equipment and systems; transportation equipment and systems; medical equipment and systems; and industrial and traffic equipment and systems, for, among others, national, state, and municipal governments.  On March 12, 2001, Siemens became listed on the New York Stock Exchange, subjecting itself as an "issuer" tot he United States' securities laws, including the Foreign Corrupt Practices Act ("FCPA").

 In November 2006, the Munich Public Prosecutor's Office conducted raids on multiple Siemens offices and the homes of Siemens employees in and around Munich, Germany, as part of an investigation of possible bribery of foreign public officials and falsification of corporate books and records.  Shortly after these raids, Siemens disclosed to the Department and to the Securities and Exchange Commission ("SEC"), which under the FCPA has civil enforcement authority over issuers, potential violations of the FCPA in multiple countries and initiated a sweeping global internal investigation.  Siemens engaged Davis Polk & Wardwell to represent the Company, and engaged Debevoise & Plimpton LLP ("Debevoise") to conduct an independent investigation for the Audit Committee.  Debevoise, in turn, hired Deloitte & Touche GmbH ("Deloitte"), translators, computer experts, litigation support firms, and other third parties to assist in the investigation.

The scope of Siemens' internal investigation was unprecedented and included virtually all aspects of its worldwide operations, including headquarters components, subsidiaries, and regional operating companies.  Compliance, legal, internal audit, and corporate finance departments were a significant focus of the investigation and were discovered to be areas of the company that played a significant role in the violations.  Finally, the role and awareness of Siemens' Managing Board and Supervisory Board in serious compliance failures were the

subject of particular scrutiny of the Audit Committee and the Department.  Debevoise and Deloitte, at the direction of Siemens, provided frequent and extensive reports to the Department and the SEC in face-to-face presentations and conference calls that assisted the Department's investigation enormously.

As described below, Siemens has provided extraordinary cooperation in connection with the investigation of its past corporate conduct, and has undertaken uncommonly sweeping remedial action in response to the discovery of its prior misconduct.  In addition, Siemens has provided substantial and timely assistance in the investigation of other persons and entities.

## 2.    Summary of Facts

The Debevoise internal investigation uncovered evidence of corruption by Siemens spanning several decades in many operating groups and regions.  Equally if not more important, the internal investigation revealed knowing failures to implement, and circumvention of, internal controls up to the most senior echelons of management.  Wilmer Cutler Pickering Hale & Dorr LLP, which was engaged to conduct a related investigation into Siemens' United Nations Oil for Food Program contracts, discovered evidence confirming the Volcker Commission's findings that several Siemens AG subsidiaries made significant kickback payments to the Iraqi government in connection with the Oil for Food Program.  The Debevoise internal investigation and the Department's investigation also revealed evidence of corrupt and improperly recorded payments with a strong nexus to the U.S. by two Siemens subsidiaries, Siemens Venezuela and Siemens Bangladesh, as well as evidence of improperly recorded payments with respect to an additional subsidiary, Siemens Argentina.

### a.    Siemens' Knowing Falsification of Books and Records and Knowing Failures in and Circumvention of Internal Controls

From in or about the mid-1990s to in or about 2007, Siemens engaged in systematic efforts to knowingly falsify its corporate books and records and to knowingly fail to implement and to circumvent existing internal controls.  These systematic efforts included, but were not limited to:  (a) using off-books accounts for corrupt payments even after compliance risks associated with such accounts were raised at the highest levels of management; (b) entering into purported business consulting agreements with no legitimate business purpose, sometimes after Siemens had won the relevant project; (c) engaging former Siemens employees as purported business consultants to act as conduits for corrupt payments to government officials; (d) justifying payments to purported business consultants based on false invoices; (e) mischaracterizing corrupt payments in the corporate books and records as consulting fees and other seemingly legitimate expenses; (f) limiting the quantity and scope of audits of payments to purported business consultants; (g) accumulating profit reserves as liabilities in internal balance sheet accounts and then using them to make corrupt payments through business consultants as needed; (h) using removable Post-It notes to affix signatures on approval forms authorizing payments to conceal the identity of the signors and obscure the audit trail; (I) allowing third party payments to be made based on a single signature in contravention of Siemens' "four eyes principle," which required authorization of payments by two Siemens managers; (j) drafting and backdating sham business consulting agreements to justify third party payments; and (k) changing the name of purported business consulting agreements to "agency agreements" or similar titles to avoid detection.

### 1)     Siemens' Use of Payment Mechanisms

From on or about March 12, 2001 to in or about 2007, Siemens made payments totaling approximately $1,360,000,000 through various mechanisms.  Of this amount, $805,500,000 was intended in whole or in part as corrupt payments to foreign officials through various payment mechanisms, as explained in more detail in the Siemens criminal information.

### 2)     Siemens' United Nations Oil for Food Program Contracts

In addition, from in or about 2000 to in or about 2002, four Siemens AG subsidiaries - Siemens S.A.S. of France ("Siemens France"), Siemens Sanayi ve Ticaret A.S. of Turkey ("Siemens Turkey"), Osram Middle East FZE ("Osram Middle East"), and Gas Turbine Technologies S.p.A. ("GTT") - each wholly owned by Siemens or one of its subsidiaries, were awarded 42 contracts with a combined value of more than $80,000,000 with the Ministries of Electricity and Oil of the Government of the Republic of Iraq under the United Nations Oil for Food Program.  To obtain these contracts, Siemens France, Siemens Turkey, Osram Middle East, and GTT paid a total of at least $1,736,076 in kickbacks to the Iraqi government, and they collectively earned over $38,000,000 in profits on those 42 contracts.

In order to generate the funds to pay the kickbacks to the Iraqi government and to conceal those payments, Siemens France, Siemens Turkey, Osram Middle East, and GTT inflated the price of the contracts by approximately 10% before submitting them to the United Nations for approval.  In order to conceal on their corporate books and records the kickback payments made to the Iraqi government, Siemens France, Siemens Turkey, Osram Middle East, and GTT improperly characterized payments to purported business consultants, part of which were paid as kickbacks to the Iraqi government, as "commissions" to the business consultants.  For the

5

relevant years, the books and records of Siemens France, Siemens Turkey, Osram Middle East, and GTT, including those containing false characterizations of the kickbacks paid to the Iraqi government, were part of the books and records of Siemens.

### b.    Siemens Argentina's Improperly Recorded Payments

Siemens Argentina was a wholly owned subsidiary of Siemens AG.  Beginning around September 1998 and continuing until 2007, Siemens Argentina made and caused to be made significant payments to various Argentine officials, both directly and indirectly, in an effort to retain current business or secure future business.

In or about 1994, the Argentine government issued a tender for bids to replace the then existing manually-created national identity booklets with state of the art national identity cards (the "national identity card project").  The total estimated value of the national identity card project was $1 billion.  In February 1998, Siemens Argentina and its affiliates were awarded the national identity card project contract by the Argentine Ministry of the Interior.  In approximately September 1998, Siemens Argentina began making and causing to be made multiple payments to a group of purported business consultants (the "Argentine Consulting Group") in connection with the national identity card project, despite the fact that the Argentine Consulting Group provided no legitimate services on the project.  Siemens Argentina employees understood these payments to be, at least in part, bribes for the high-level Argentine government officials responsible for awarding Siemens Argentina and its affiliates the identity card project.

From in or about 1997 to in or about January 2007, Siemens Argentina paid or caused to be paid at least $15,725,000 directly to entities controlled by members of the Argentine government, at least $35,150,000 directly to the Argentine Consulting Group, and at least

$54,908,000 to other entities.  Some of the corrupt payments were approved by Siemens Argentina personnel or agents from within the United States or paid into United States bank accounts.  From the date Siemens became an issuer on March 12, 2001 through in or about January 2007, Siemens Argentina made approximately $31,263,000 in corrupt payments through the Argentine Consulting Group and other entities, and improperly characterized those corrupt payments in its books and records as legitimate payments for "consulting fees" or "legal fees." Siemens Argentina's books and records, including those containing the false characterizations of the corrupt payments, were part of the books and records of Siemens.

### c.    Siemens Bangladesh's Corrupt and Improperly Recorded Payments

From 2000 to 2002, the Bangladesh Telegraph Telephone Board (the "BTTB"), a government-owned telecommunications regulatory entity in Bangladesh, conducted a series of three open tenders for a mobile telephone project (the "BTTB Project") that was ultimately awarded to Siemens.  In 2000, the BTTB conducted the first tender for the BTTB Project contract.  Siemens was excluded from the first tender for technical non-compliance, but the tender was subsequently cancelled.  The second tender in 2001 was cancelled and reissued because of a change in government.  Siemens was initially disqualified from the third tender, but in partnership with Siemens Bangladesh and Siemens Mobile Communications S.p.A. (then a Siemens subsidiary located in Milan, Italy), ultimately was awarded part of that tender in June 2004.  Siemens' and its subsidiaries' portion of the contract value was $40,887,000.

From May 2001 to August 2006, Siemens Bangladesh, which was responsible for the local operations on the project, engaged or caused to be engaged purported business consultants to pay bribes to various Bangladeshi officials in exchange for favorable treatment during the

bidding process.  Siemens Bangladesh caused to be paid at least $5,319,839.83 to the purported

business consultants.  Siemens Bangladesh caused at least one payment to be made to each of

these purported consultants from a United States bank account, and the remaining payments to be

made through payment intermediaries.

Siemens Bangladesh knew that the purported business consultants were passing along

some or all of the money they received from Siemens Bangladesh to senior Bangladeshi

government officials in exchange for favorable treatment of Siemens AG in the BTTB Project

bid process.  In September 2004, Siemens Bangladesh learned that one of the purported business

consultants had moved to the United States, after which Siemens Bangladesh continued to cause

him to be paid purported consulting fees to an account in Hong Kong.  In 2003, Siemens

Bangladesh also made payments of at least $16,000 directly to Bangladeshi government officials,

or relatives of Bangladeshi officials, with responsibility for awarding the BTTB Project.

Siemens Bangladesh caused these payments to be improperly recorded on Siemens' books and

records as "consulting fees" and other seemingly legitimate payments.

### d.    Siemens Venezuela's Corrupt and Improperly Recorded Payments

Beginning around November 2001 and continuing until around May 2007, Siemens

Venezuela made and caused to be made significant payments to various Venezuelan officials,

indirectly through purported business consultants, in exchange for favorable business treatment.

The payments were related to two major transportation infrastructure projects.

### 1)    Metro Valencia Project

In or about 1996, Siemens was awarded a contract to design and build a rail mass transit

system in the City of Valencia, Venezuela (the "Metro Valencia project").  Due to the size, cost,

and complexity of the project, work was performed in several phases, each of which was governed by a contract between a Siemens entity and the city of Valencia.  The total estimated value of all the contracts was $240,000,000.  Siemens Venezuela was responsible for overseeing certain administrative aspects of the contracts, including the hiring and payment of business consultants.

### 2)      Metro Maracaibo Project

In 2000, the city of Maracaibo, Venezuela, and the State of Zulia, Venezuela, solicited bids for a contract to design and build a rail mass transit system in the city of Maracaibo (the "Metro Maracaibo project").  Siemens Venezuela and its affiliates submitted a bid.  Prior to opening the bids, a dispute arose between the Mayor of Maracaibo, who favored the project, and the Governor of the State of Zulia, who opposed the project.  In or about 2000, Siemens Venezuela hired a purported business consultant in connection with the dispute.  Following that, the project was unanimously approved at a Metro Maracaibo board meeting, which the representatives from the Governor's Office failed to attend.  The total value for the contract and project was over $100,000,000.  Siemens Venezuela was responsible for overseeing certain administrative aspects of the contracts, including the hiring and payment of business consultants.

### 3)      Total Corrupt Payments by Siemens Venezuela

From in or about November 2001 through in or about May 2007, Siemens Venezuela paid and caused to be paid at least $18,782,965 to various purported business consultants with the understanding that some or all of those funds would be passed along to Venezuelan government officials for the corrupt purpose of obtaining and retaining government contracts in Venezuela relating to the Metro Valencia and Metro Maracaibo projects.  Some of those payments were

made using United States bank accounts controlled by the purported business consultants. Siemens Venezuela caused these payments to be improperly recorded on Siemens' books and records as "consulting fees," payments for "studies," and other seemingly legitimate payments.

### 3. Dispositions With Siemens, Siemens Argentina, Siemens Bangladesh, and Siemens Venezuela

#### a. Summary of Criminal Charges

The Department and Siemens agree that the appropriate resolution of this matter consists of guilty pleas pursuant to plea agreements with Siemens, Siemens Argentina, Siemens Bangladesh, and Siemens Venezuela. The Siemens information charges (a) a violation of the FCPA's internal controls provisions under 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), and 78ff(a) (Count One); and (b) a violation of the FCPA's books and records provisions under 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), and 78ff(a) (Count Two). The Siemens Argentina information charges a single count of conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, with a single object - to violate the books and records provisions of the FCPA. The proposed informations against Siemens Bangladesh and Siemens Venezuela each charge a single count of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, with two objects - to violate the FCPA's antibribery provisions and to violate the FCPA's books and records provisions.

#### b. Summary of Plea Agreements

The proposed plea agreements contain the following core terms: (a) agreement to plead guilty to the charges in the informations in the District of Columbia, the factual allegations of which Siemens, Siemens Venezuela, Siemens Bangladesh, and Siemens Argentina agree not to contest; (b) a total criminal penalty of $450,000,000, apportioned as follows: a $448,500,000 fine

for Siemens; and a $500,000 fine (the statutory maximum for conspiracy) for each of Siemens Argentina, Siemens Bangladesh, and Siemens Venezuela; (c) a continuing obligation to provide full, complete, and truthful cooperation to the Department and any other law enforcement agency, domestic or foreign, with which the Department directs Siemens to cooperate, in particular the Munich Public Prosecutor's Office; (d) implementation of rigorous compliance enhancements, including periodic testing of same, with a recognition that Siemens has already implemented substantial compliance changes over the course of the investigation; and (e) retention of an independent monitor, who will, over a four-year term, conduct a review of the compliance code, Siemens' internal controls and related issues, and will prepare periodic reports on his reviews.

In accordance with the Department's Principles of Federal Prosecution of Business Organizations, the Department considered a number of factors in its decisions regarding the overall disposition.  Those factors included, but were not limited to, Siemens' cooperation and remediation efforts, as well as any collateral consequences, including whether there would be disproportionate harm to the shareholders, pension holders, employees, and other persons not proven personally culpable, and the impact on the public, arising from the prosecution.  The Department's analysis of collateral consequences included the consideration of the risk of debarment and exclusion from government contracts.  In considering the overall disposition, the Department also considered related cases of other governmental authorities.

4.      **Sentencing Guidelines Calculation and Criminal Penalties**

a.      **Siemens Sentencing Guidelines Calculation**

As set forth in paragraph 4 of the plea agreement, the parties agree that the following

Sentencing Guidelines provisions, using the 2007 Sentencing Guidelines Manual, apply based on

the facts of this case, for purposes of determining an advisory guideline range:

| | | |
|---|---|---|
| § 2B1.1(a)(2) | Base Offense Level | 6 |
| § 2B1.1(b)(1)(P) | Loss of $400 million or more | 30 |
| § 2B1.1(b)(2)(c) | Over 250 victims | 6 |
| § 2B1.1(b)(9) | Significant Conduct Outside U.S./ Sophisticated Means | 2 |
| **TOTAL OFFENSE LEVEL** | | **44** |

Calculation of Culpability Score:

| | | |
|---|---|---|
| § 8C2.5(a) | Base Score | 5 |
| § 8C2.5(b)(1) | 5,000 or More Employees and High-Level Personnel Involvement/ Pervasive Tolerance | 5 |
| § 8C2.5(g)(2) | Full Cooperation and Acceptance of Responsibility | -2 |
| **TOTAL CULPABILITY SCORE** | | **8** |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine: Greater of the amount from table in U.S.S.G. § 8C2.4(a)(1) & (d) corresponding to offense level of 44 ($72,500,000), or the pecuniary gain/loss from the offense ($843,500,000) (U.S.S.G. § 8C2.4(a)(2)): | $843,500,000 |
| Multipliers, culpability score of 8 (U.S.S.G. § 8C2.6): | 1.6-3.2 |
| Fine Range (U.S.S.G. § 8C2.7): | $1.35 billion - $2.70 billion |

12

### b.    Siemens Loss Figure

For purposes of calculating "loss" under U.S.S.G. § 2B1.1(b)(1)(P), the parties combined the $805,500,000 in corrupt payments, with the pecuniary gain of $38,000,000 on the Oil for Food contracts, to arrive at a total of $843,500,000.  The rationale for using this figure was that calculating a traditional loss figure in a case of this magnitude, involving literally thousands of contracts over many years, would be overly burdensome, if not impossible.  The commentary to U.S.S.G. § 2B1.1 states that where loss cannot reasonably be determined, gain is an alternative measure of loss.  Because the Oil for Food profits are calculable, those $38,000,000 in profits are included as the "loss" figure for purposes of the Oil for Food conduct.

For the remaining conduct, however, a determination of either true loss or gain is not reasonably calculable.  The controls failures and books and records falsifications in this case spanned many thousands of projects over a long time period, and to calculate loss or gain on a project-by-project basis would take an unreasonable amount of time and resources.  The commentary to U.S.S.G. § 2B1.1 relating to "Government Benefits" is instructive here.  It provides that in cases involving government benefits, "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be."  U.S.S.G. § 2B1.1, comment. (n. 3(F)(ii)).  Although the commentary is intended to apply to cases involving government grants, loans, and entitlement programs, a case like this one can be viewed through the same prism.  In this case, the amount "obtained by unintended recipients or diverted to unintended uses" is arguably the amount of money directly involved in the corrupt payments.  Accordingly, the parties used $805,500,000 in calculating the loss figure for the conduct unrelated to the Oil for Food contracts.

### c.      Siemens Fine

Pursuant to Fed. R. Crim. P. 11(c)(1)(c), the Department and Siemens agree that the

appropriate criminal fine in the case, after consideration of (a) the appropriate consideration of

the Sentencing Guidelines, (b) Siemens' assistance in the investigation of other individuals and

organizations pursuant to U.S.S.G. § 8C4.1, (c) its prior and anticipated payments of fines or

disgorgement in other related proceedings both in the U.S. and abroad, (d) its substantial

compliance and remediation efforts, (e) its extraordinary rehabilitation, and (f) the factors set

forth in 18 U.S.C. § 3553(a), is $448,500,000.  Although this represents a number below the

advisory sentencing guideline range, the Department and Siemens agree and stipulate that the

factors mentioned above and those described elsewhere in this Sentencing Memorandum

represent mitigating circumstances "of a kind, or to a degree, not adequately taken into

consideration by the United States Sentencing Commission."  18 U.S.C. § 3553(b)(1).

### d.      Subsidiary Fines

The statutory maximum sentence that the Court can impose on an organization for a

violation of Title 18, United States Code, Section 371, is a fine not exceeding $500,000 (18

U.S.C. §3571(c)(3)) or twice the pecuniary gain derived from the offense or twice the pecuniary

loss suffered by a person other than defendant, unless imposition of a fine under this provision

would unduly complicate or prolong the sentencing process (18 U.S.C. §3571(d)); five years'

probation, 18 U.S.C. § 3561(c)(1); and a mandatory special assessment of $400, 18 U.S.C. §

3013(a)(2)(B).

The parties agree that, in light of (a) the complexity of the overall dispositions with

Siemens and its subsidiaries, and (b) the interrelationship and overlap among and between the

charges and conduct underlying those dispositions, application of the Alternative Fines Act, 18 U.S.C. § 3571(d), to this case would unduly complicate or prolong the sentencing process. Accordingly, the maximum fine under the Sentencing Guidelines is $500,000 as provided in 18 U.S.C. § 3571(c)(3).  Accordingly, the parties agree that $500,000 is the appropriate criminal fine for each of Siemens Argentina, Siemens Bangladesh, and Siemens Venezuela.

    **5.**      **Siemens' Substantial Assistance, Cooperation, and Remediation Efforts**

The Department believes the above-proposed penalties are appropriate based on Siemens' substantial assistance to the Department in the investigation of other persons and entities, its extraordinary efforts to uncover evidence of prior corrupt activities, and in its extensive commitment to restructure and remediate its operations to make it a worldwide leader in transparent and responsible corporate practices going forward, all of which are described in more detail below.

If the plea agreement were being filed pursuant to Fed. R. Crim. P. 11(c)(1)(B) instead of pursuant to Fed. R. Crim. P. 11(c)(1)(c), the Department believes that the facts contained in the Department's Sentencing Memorandum would merit a motion for downward departure with respect to Siemens.  U.S.S.G § 8C4.1, the corporate analogue to U.S.S.G § 5K1.1, provides for downward departures from the advisory sentencing guideline range based on the defendant's "substantial assistance in the investigation or prosecution of another organization that has committed an offense, or in the investigation or prosecution of an individual not directly affiliated with the defendant who has committed an offense."

If the plea agreement were being filed pursuant to Fed. R. Crim. P. 11(c)(1)(B) and the Department were filing a motion for downward departure with respect to Siemens, it would also

argue that under 18 U.S.C. § 3553(b)(1) and the introductory commentary to U.S.S.G § 8C4, departure is warranted if the court finds "that there exists an aggravating or mitigating circumstance of a kind, *or to a degree*, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." (Emphasis added).  Because Siemens did not voluntarily disclose the conduct before the Munich Public Prosecutor raided its offices, it only receives a two-point reduction in its culpability score, which is incongruent with the level of cooperation and assistance provided by the company in the Department's investigation.

The Department's and Siemens' proposed criminal penalty of $448,500,000 would be the same in the event of a plea under Fed. R. Crim. P. 11(c)(1)(B) accompanied by a motion for downward departure.  Nevertheless, the Department and Siemens AG agreed that filing the plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(c) was more appropriate in this case.

### a.    Substantial Assistance in the Investigation of Others

As part of its overall cooperation efforts, Siemens (primarily through Debevoise and Deloitte) has developed and timely provided detailed and significant information regarding third parties, including individuals and entities that were used as conduits to conceal corrupt payments made to foreign government officials.  Several of these individuals and entities were located in the United States and utilized United States banks to facilitate the payments.[1]  Siemens has assisted in the investigation of these individuals and entities by initially disclosing the existence

---

[1]  As part of the internal investigation, in consultation with the Department and the SEC, Siemens sought to identify any pertinent transactions involving its U.S. operations, including any regional operating companies or divisions, U.S. bank accounts, and business consultants with ties to the U.S.

of the activities, and then providing detailed and useful information obtained from interviews of Siemens employees, corporate records, and bank and other financial records. Frequently, this detailed information has been presented during debriefing sessions that included PowerPoint presentations together with binders of pertinent documents. Because many Siemens documents are in German or other foreign languages, Siemens has routinely provided English language translations of documents produced, thereby saving the Department very significant time and expense.

In certain instances, Siemens has provided forensic analyses of bank records and payments that have greatly assisted in the tracing of multi-layered financial transactions. Many of these transactions involved the movement of funds through several countries. It was only through the extensive, worldwide investigative efforts of the internal investigators that these complex criminal activities were uncovered. As a practical matter, it would have been exceedingly difficult for the Department to identify and obtain the necessary foreign financial records, review them, trace proceeds, and identify and interview potential witnesses, all between late 2006 and the present. Furthermore, the documentation and analysis undertaken by Siemens has been possible only because it took aggressive steps starting immediately after the Munich raids to preserve evidence in both electronic and hard copy form. A summary of the specific substantial assistance efforts, identifying the persons and entities involved, appears in a separate pleading being filed under seal.

In addition to the many timely and useful presentations to the Department and the SEC, Siemens has undertaken significant similar efforts to cooperate with foreign law enforcement authorities who have been conducting investigations of alleged improper payments abroad. In

addition to the Munich Public Prosecutor's Office, the Department understands that Siemens has

cooperated extensively with law enforcement authorities in numerous countries, including but

not limited to, Bangladesh, Greece, and Nigeria.  Siemens has also fully cooperated with several

international development banks, including the World Bank and the Inter-American

Development Bank, in connection with Siemens projects that received funding from those banks.

Siemens interacted with the relevant government and inter-governmental entities in a transparent

fashion, such that it facilitated communication between and among the Department and the SEC

and these bodies.  These efforts have set a standard going forward for the type of multi-national

cooperation that can greatly enhance worldwide law enforcement efforts involving corruption of

foreign officials.

### b.        Siemens' Exceptional Cooperation

The Department views as exceptional Siemens' wide-ranging cooperation efforts

throughout this investigation, which included a sweeping internal investigation, the creation of

innovative and effective amnesty and leniency programs, and exemplary efforts with respect to

preservation, collection, testing, and analysis of evidence.

### 1)        Extensive Internal Investigation

Within a short time after the Munich Public Prosecutor's Office conducted raids of

Siemens' offices in November 2006, Siemens retained Debevoise "to conduct an independent

and comprehensive investigation to determine whether anti-corruption regulations have been

violated and to conduct an independent and comprehensive assessment of the compliance and

control systems at Siemens."  Siemens has since then provided its unwavering support and

commitment to this investigation.  By all indications, Debevoise has been permitted to conduct

its investigation in a completely independent fashion, without limitations as to scope or duration. According to Siemens' latest estimates, over 1.5 million hours of billable time by Debevoise and Deloitte professionals have been devoted to the investigation. This includes the extensive and sustained participation of approximately 100 lawyers and 100 support staff from Debevoise and 130 forensic accountants and support staff from Deloitte. The investigative work has taken place in 34 countries and has involved over 1,750 interviews and over 800 informational meetings. Over 100 million documents have been collected and preserved, many of which have been searched or reviewed for evidence relevant to the investigation. Siemens, either directly or through Debevoise, has produced to the Department over 24,000 documents, amounting to over 100,000 pages.

To ensure that Debevoise and Deloitte had the support needed within Siemens to effectively conduct their investigation, Siemens stressed to all employees that they must fully cooperate in the investigation. In addition, Siemens established a Project Office at headquarters staffed by 16 full-time employees that facilitated interviews and document collection. To facilitate visits to regional companies by the investigation team, the Project Office communicated with regional management to explain and prepare them for the interviews and other investigative work.

### 2)      Amnesty and Leniency Programs

In consultation with the Department, Siemens designed and implemented a company-wide amnesty program to facilitate the internal investigation. This amnesty program was implemented on October 31, 2007 and continued until approximately February 29, 2008. The program provided that all but the most senior employees who voluntarily disclosed to Debevoise

19

truthful and complete information about possible violations of relevant anti-corruption laws would be protected from unilateral employment termination and company claims for damages. The policy that implemented the amnesty program made clear that it was in no way binding on any prosecutors or regulators, including the Department and the SEC, but that Siemens would bring an employee's cooperation to the attention of such authorities if he or she were the subject of a government investigation.

For employees too senior to qualify for the amnesty program, as well as those employees who did not come forward during the amnesty program period, Siemens established a similar leniency program on April 4, 2008.  The leniency program provided for individualized leniency determinations for cooperating employees.  The creation of these two programs was a unique and effective way to further the investigation and it yielded impressive results.  Over 100 employees provided information in connection with the programs, including numerous employees who previously provided incomplete or less than truthful information and employees who had not come forward previously.

Shortly after the amnesty program began, the Department and the SEC identified various individuals and projects for more extensive debriefings by Siemens, referred to by the parties as "deep dives."  The amnesty and leniency programs were vital to obtaining the types of detailed information needed for the deep dives.  These deep dive sessions greatly enhanced the Department's ability to evaluate the overall case, properly target its limited resources, and develop the evidence necessary to bring the charges here.

### 3)    Preservation, Collection, Testing, and Analysis of Evidence

At the outset of the internal investigation, Siemens instituted a worldwide data preservation policy directing that employees secure and preserve, among other things, all documents relating to financial transactions; all corporate books and records; records of any payments to government officials; and records concerning consultants, agents, or other third parties that assisted Siemens in obtaining business.  Siemens took extensive steps using technological and human resources to ensure successful preservation of these documents.  One of the primary functions of the Project Office has been to ensure that employees have complied with the data preservation policy.

Due to the enormous volume of records and the data protection laws in various countries, document preservation and production have been complex and expensive.  Siemens established special offices in Germany and China to collect, review, process, and store documents in connection with the investigation.  To date, Siemens has spent over $100 million on document collection, review, processing and storage, including those facilities in Germany and China.  Although data protection laws, including those in Germany, have at times limited or delayed Siemens' production of certain documents, Siemens has worked hard to take necessary steps and, where necessary, obtain approvals from foreign authorities, to make the documents available to the Department and the SEC as promptly as possible and in compliance with relevant data privacy laws and other legal restrictions.

Siemens' extensive efforts in preserving and making available documents from foreign countries have been exemplary and serve as a model to other multi-national companies seeking to cooperate with law enforcement authorities.

### c.      Remediation Efforts

Since the beginning of the internal investigation, Siemens' remediation efforts have been exceptional.  Siemens has replaced nearly all of its top leadership, including the Chairman of the Supervisory Board,[2] the Chief Executive Officer, the General Counsel, the Head of Internal Audit, and the Chief Compliance Officer.  The Company has terminated members of senior management implicated in the misconduct uncovered by the investigation and has reorganized the Company to be more centralized from both a business and compliance perspective.  This includes the creation of a new position on the Managing Board with specific responsibility for legal and compliance matters.

Siemens also overhauled and greatly expanded its compliance organization, which now totals more than 500 full time compliance personnel worldwide.  Control and accountability for all compliance matters is vested in a Chief Compliance Officer, who, in turn, reports directly to the General Counsel and the Chief Executive Officer.  Siemens has also reorganized its Audit Department, which is headed by a newly appointed Chief Audit Officer who reports directly to Siemens' Audit Committee.  To ensure that auditing personnel throughout the company are competent, the Chief Audit Officer required that every member of his 450 person staff reapply for their jobs.

Siemens also has enacted a series of new anti-corruption compliance policies, including a new anti-corruption handbook, sophisticated web-based tools for due diligence and compliance

---

[2] Siemens has a Supervisory Board, consisting of 10 members elected by shareholders and 10 members elected by employees.  It also has a Managing Board, responsible for managing the company's business.  The Supervisory Board appoints and removes members of the Managing Board and generally oversees the company's management, but is not permitted to make management decisions.

matters, a confidential communications channel for employees to report irregular business practices, and a corporate disciplinary committee to impose appropriate disciplinary measures for substantiated misconduct.

Siemens has organized a working group devoted to fully implementing the new compliance initiatives, which consists of employees from Siemens' Corporate Finance and Corporate Compliance departments, and professionals from PricewaterhouseCoopers ("PwC"). This working group developed a step-by-step guide on the new compliance program and improved financial controls known as the "Anti-Corruption Toolkit."  The Anti-Corruption Toolkit and its accompanying guide contain clear steps and timelier required of local management in the various Siemens entities to ensure full implementation of the global anti-corruption program and enhanced controls.  Over 150 people, including 75 PwC professionals, provided support in implementing the Anti-Corruption Toolkit at 162 Siemens entities, and dedicated support teams spent six weeks on the ground at 56 of those entities deemed to be "higher risk," assisting management in those locations with all aspects of the implementation.  The total external cost to Siemens for the PwC remediation efforts has exceeded $150 million.

In addition to these efforts, during the investigation, Siemens imposed a moratorium on entering into new business consulting agreements or making payments under existing business consulting agreements until a complete collection and review was undertaken of all such agreements.  Siemens also initiated, and has nearly completed, a review of all third party agents with whom it has agreements.  This has resulted in a significant reduction in the number of business consultants used by Siemens.

Siemens also significantly enhanced its review and approval procedures for business consultants, in light of the past problems.  The new state-of-the-art system requires any employee who wishes to engage a business consultant to enter detailed information into an interactive computer system, which assesses the risk of the engagement and directs the request to the appropriate supervisors for review and approval.  Siemens has also increased corporate-level control over company funds and has centralized and reduced the number of company bank accounts and outgoing payments to third parties.

The reorganization and remediation efforts of Siemens have been extraordinary and have set a high standard for multi-national companies to follow.   These measures, in conjunction with Siemens' agreement to retain a Monitor (with support from a U.S. law firm with FCPA and compliance expertise) for a term of four years, highlight the serious commitment of Siemens to ensure that it operates in a transparent, honest, and responsible manner going forward.

**CONCLUSION**

For the foregoing reasons, the Department respectfully recommends that the Court sentence Siemens to a fine in the amount of $448,500,000 and a special assessment of $800; and that the Court sentence Siemens Venezuela, Siemens Bangladesh, and Siemens Argentina each to a fine in the amount of $500,000 and a special assessment of $400.

STEVEN A. TYRRELL
Chief
Fraud Section, Criminal Division

By: _____/s/_____
Mark F. Mendelsohn
Deputy Chief
Fraud Section, Criminal Division
(202) 514-1721

By: _____/s/_____
Lori A. Weinstein
Trial Attorney – Foreign Corrupt Practices Act
Fraud Section, Criminal Division
(202) 514-0839

United States Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005

JEFFREY A. TAYLOR
United States Attorney


By: _____/s/_____

John D. Griffith
Assistant United States Attorney
District of Columbia
Fraud and Public Corruption Section
(202) 353-2453

United States Attorney's Office
555 Fourth Street, NW
Washington, D.C. 20530